IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| LAKEHILL INVESTMENTS LLC, a Washington limited liability company, | ) ) ) | No. 79116-8-I |
| Appellant/Cross Respondent, | ) ) | |
| v. | ) ) | |
| RUSHFORTH CONSTRUCTION COMPANY, INC., d/b/a AP RUSHFORTH, a Washington corporation, and ADOLPH & PETERSON, INC., a Minnesota corporation, | ) ) ) ) ) ) ) ) | PUBLISHED OPINION |
| Respondent/Cross Appellant. | ) ) ) | |

VERELLEN, J. — A contractor accused of breach of contract due to construction defects may assert the affirmative defense that the owner's plans and specifications were defective and caused all of the construction defects. Because the successful affirmative defense shields the contractor from all liability, the contractor is required to prove all construction defect damages established by the owner are attributable to defective plans and specifications. Here, jury instruction 9 misstated AP Rushforth Construction Company's burden of proving its affirmative defense, and a new trial is required.

Lake Hills Investments, LLC assigns error to two other instructions but fails to demonstrate prejudice. The court's instruction on liquidated construction delay damages misled the jury that it could excuse AP from delay days caused by agents of AP, but Lake Hills does not establish any prejudice. The court should have instructed the jury that only a material breach of the duty of good faith and fair dealing by hindrance could excuse performance by AP, but under these circumstances, the omission of "material" was harmless. None of the other issues raised on appeal and cross appeal warrant any relief.

Therefore, we reverse and remand for a new trial.

FACTS

Lake Hills Village consists of several buildings constructed around a large parking lot. The buildings are a public library, two mixed-use residential/retail buildings, three commercial buildings, and some townhouses. Connecting the library and an adjacent commercial building are an elevator tower and a pedestrian bridge.

These structures were constructed over several years in several phases. AP was the general contractor for four phases. Phase 1 was construction of the library and Building A, a commercial building. Phase 2C was construction of half of a large underground parking garage, including a large concrete slab on the ground; the concrete topping slab on the parking garage, which also served as the above-ground parking lot; and foundation work on the mixed-use buildings and another commercial building, which are called, respectively, Building B, Building C,

2

and Building D.  Phase 3 was completing construction of Buildings B, C, and D.  Phase 4 was construction of the townhomes.  Phase 5A was construction of the elevator tower, the pedestrian bridge, the rest of the underground parking garage, and construction of retail space under Building A.  Phase 5B was construction of the third commercial building, Building F.

Construction on AP's portion of Lake Hills Village was supposed to begin on February 16, 2013, and be completed by January 31, 2015.  Each phase of the project had its own substantial completion date, and Lake Hills could assess liquidated damages for delay days past those substantial completion dates.[1]  Every phase of the project AP was contracted to build, phases 2C, 3, 5A, and 5B, was delayed.  In November of 2014, Lake Hills notified AP it was in breach of the contract schedule and blamed AP's management practices and insufficient jobsite staffing.  Lake Hills also began identifying work it considered defective, such as excessive cracking in the concrete garage floor slab.  AP blamed the delays on Lake Hills "arbitrarily" cutting its pay applications, making it difficult for it to hire and retain subcontractors.[2]  AP blamed construction defects on Lake Hills providing "a

---

[1] At trial, the parties disputed whether delay days for purposes of liquidated damages were calculated per phase per day, totaling $10,000 per calendar day if each of the four contractual phases was simultaneously delayed, or was calculated for the entire project.  The jury concluded it applied per phase per day but that the parties did not intend to assess liquidated damages for phases 5A and 5B.  These findings have not been challenged.

[2] Report of Proceedings (RP) (July 30, 2018) at 2476-77; RP (Aug. 7, 2018) at 3482-83.

sketch" or "a concept" rather than buildable designs.[3]  Relations deteriorated, and in late October of 2015, Lake Hills filed suit against AP for breach of contract.  AP stopped work a few weeks later and filed its own breach claim alleging underpayment.

Pretrial, the parties produced more than 1,000,000 documents, took 59 depositions, and participated in six days of mediation.  The court ruled that neither party could introduce evidence of the other party's "[d]isputes with others," and the court prohibited AP from introducing evidence of certifications Lake Hills made to its lender when requesting funds.[4]

The trial lasted almost two months, and the jury heard from two dozen witnesses.  One witness, Oscar Del Moro, the owner's representative overseeing the Lake Hills Village project, testified for six-and-a-half days.  Using a special verdict form, the jury returned a mixed verdict.  It found that construction defects by AP breached the contract and awarded damages in six of eight areas of claimed defects.  The jury also found that each phase of the project was completed past its substantial completion date, Lake Hills was responsible for the vast majority of delay days, AP did not breach by stopping work, and Lake Hills breached the contract by underpaying AP.  The court awarded a net judgment in favor of AP of $9,624,695.80, including $5,866,016 in attorney fees and costs.

Lake Hills appeals, and AP cross appeals.

---

[3] RP (Aug. 2, 2018) at 3203.

[4] RP (June 25, 2018) at 39.

## ANALYSIS

I. Jury Instructions

Lake Hills argues the court gave three erroneous jury instructions and erred by refusing to adopt its proposed instruction. We review jury instructions "'de novo if based upon a matter of law or for abuse of discretion if based upon a matter of fact.'"[5] Jury instructions are legally erroneous when, read as a whole, they fail to allow a party to argue its theory of the case, mislead the jury, or fail to inform the jury of the applicable law.[6] An erroneous instruction is grounds for reversal if it prejudiced a party.[7] We presume a party was prejudiced when the instruction contains a clear misstatement of the law, but when the instruction was merely misleading, the appellant must prove the instruction was prejudicial.[8] The presumption of prejudice can be overcome on a showing that the error was harmless.[9]

---

[5] Hendrickson v. Moses Lake Sch. Dist., 192 Wn.2d 269, 274, 428 P.3d 1197 (2018) (internal quotation marks omitted) (quoting Taylor v. Intuitive Surgical, 187 Wn.2d 743, 767, 389 P.3d 517 (2017)).

[6] Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 860, 281 P.3d 289 (2012) (quoting Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)).

[7] Id. (citing Joyce v. Dep't of Corr., 155 Wn.2d 306, 323, 119 P.3d 825 (2005)).

[8] Id. (citing Keller v. City of Spokane, 146 Wn.2d 237, 249-50, 44 P.3d 845 (2002)).

[9] Paetsch v. Spokane Dermatology Clinic, P.S., 182 Wn.2d 842, 849, 348 P.3d 389 (2015) (citing Griffin v. W. RS, Inc., 143 Wn.2d 81, 91, 18 P.3d 558 (2001)).

A. Jury Instruction 9

When an owner includes its building plans and specifications as part of a contract, the contract contains an implied warranty that the plans and specifications are workable and sufficient.[10] Breach of that warranty could be the basis of a contractor's claim,[11] counterclaim,[12] or affirmative defense.[13] Here, AP alleged an affirmative defense based upon Lake Hills' implied warranty, so our analysis is limited to breach of the owner's implied warranty as an affirmative defense.

---

[10] Tyee Constr. Co. v. Pac. Nw. Bell Tel. Co., 3 Wn. App. 37, 40-41, 472 P.2d 411 (1970) (quoting Ericksen v. Edmonds Sch. Dist. No. 15, 13 Wn.2d 398, 408, 125 P.2d 275 (1942)); 4A PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., BRUNER AND O'CONNOR ON CONSTRUCTION LAW § 13.7 (2009). Here, the issues arise between the owner and contractor. Similar disputes can arise in a variety of circumstances between parties other than owners and contractors. E.g., Huetter v. Warehouse & Realty Co., 81 Wash. 331, 142 P. 675 (1914) (action by subconcractor against general contractor alleging deficient plans).

[11] E.g., Larson v. Tacoma Sch. Dist. No. 10, 143 Wash. 414, 255 P. 113 (1927); Huetter, 81 Wash. at 332; Donald B. Murphy Contractors, Inc. v. State, 40 Wn. App. 98, 101-02, 696 P.2d 1270 (1985).

[12] E.g., King County v. Vinci Const. Grands Projets, 191 Wn. App. 142, 162-63, 364 P.3d 784 (2015), aff'd sub nom. King County v. Vinci Constr. Grands Projets/Parsons RCI/Frontier-Kemper, JV, 188 Wn.2d 618, 398 P.3d 1093 (2017).

[13] E.g., Kenney v. Abraham, 199 Wash. 167, 170, 90 P.2d 713 (1939). Although not at issue as argued on appeal, defective plans and specifications may also come into play as part of a general defense to rebut the owner's case by showing that the owner failed to establish that the contractor's deficient performance caused the particular damages alleged. See WILLIAM SCHWARTZKOPF, CALCULATING CONSTRUCTION DAMAGES § 1.07 (3d ed. Supp. 2020) ("When defending against a claim, the causal link or lack thereof between damages claimed and [the contract] entitlement asserted provides a basis upon which to attack the claim.").

Jury instruction 9 guided the jury on deciding Lake Hills' breach of contract claim alleging multiple construction defects in eight different areas of work. The parties agreed AP had a duty to build in compliance with the contract, so Lake Hills had to prove:

> 2. That AP breached the contract by failing to construct certain areas of work in compliance with the contract documents; and

> 3. That Lake Hills was damaged as a result of AP's breach.[14]

Because the jury found AP liable,[15] jury instruction 9 directed the jury to consider AP's affirmative defense that Lake Hills' defective plans or specifications caused the construction defects and its damages. The court instructed the jury:

> For its affirmative defense, AP has the burden to prove that Lake Hills provided the plans and specifications for an area of work at issue, that AP followed those plans and specifications, and that the [construction] defect resulted from defects in the plans or specifications.

> If you find from your consideration that this affirmative defense has been proved for a particular area, then your verdict should be for AP as to that area.[16]

---

[14] Clerk's Papers (CP) at 348 (jury instruction 9).

[15] The special verdict form posed a single question about liability for this multipart claim: "Do you find in favor of Lake Hills on its first breach of contract claim as to any area of work (defective work)?" CP at 370. The jury could only choose "yes" or "no," even though jury instruction 9 asked the jury to weigh liability for each "particular area of defective work." CP at 348. If the jury answered "yes," then it was directed to make damage determinations for each of the eight areas of alleged defective work. The jury found zero damages for two of the eight areas.

[16] CP at 348-49.

7

The court intended this defense to allow "apportionment of how much [each] defect is due to each party."[17] It explained "if AP did something defectively and that was 50 percent due to the plans and specifications and 50 percent due to poor workmanship, th[en] they can only claim a lack of responsibility for the 50 percent due to plans and specifications."[18]

Lake Hills argues the court erred by not stating AP's burden was to prove that the "construction defect results solely from the defective or insufficient plans or specifications."[19] As argued on appeal, jury instruction 9 presents two questions: whether the instruction on AP's affirmative defense correctly stated the law and, specifically, whether refusing to include "solely" was an abuse of discretion.[20]

An affirmative defense is an absolute bar to liability even when the plaintiff proves its case.[21] "'Affirmative defenses plead matters extraneous to the plaintiff's *prima facie* case, which deny plaintiff's right to recover, even if the allegations of

---

[17] RP (July 27, 2018) at 2402.

[18] Id. at 2401.

[19] Appellant's Br. at 28.

[20] See Housel v. James, 141 Wn. App. 748, 758, 172 P.3d 712 (2007) (the precise wording of an instruction is "within the broad discretion of the trial court") (citing State v. Alexander, 7 Wn. App. 329, 336, 499 P.2d 263 (1972)).

[21] Erickson v. Biogen, Inc., 417 F. Supp. 3d 1369, 1386 (W.D. Wash. 2019); see BLACK'S LAW DICTIONARY 528 (11th ed. 2019) (definition of "affirmative defense": "A defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true.").

the complaint are true.'"[22] Because the defendant asserting an affirmative defense presents an independent legal theory based on evidence extraneous to the plaintiff's case, it bears the burden of proof.[23]

Here, the affirmative defense in jury instruction 9 required that the jury absolve AP of liability from a construction defect in an area of work if AP established "the [construction] defect resulted from defects in the plans or specifications."[24] Thus, proof of any defect in the plans and specifications for that area contributing to a construction defect would let AP avoid all liability for that area even if Lake Hills proved AP's deficient performance caused some of the damage. This instruction incorrectly understated AP's burden of proof.[25]

Jury instruction 9 clearly misstated the law governing AP's affirmative defense, so we presume Lake Hills was prejudiced.[26] AP suggests any error was harmless because Lake Hills was able to argue its theory of the case and the jury

---

[22] Erickson, 417 F. Supp. 3d at 1386 (quoting Fed. Deposit Ins. Corp. v. Main Hurdman, 655 F. Supp. 259, 262 (E.D. Cal. 1987)).

[23] See Main Hurdman, 655 F. Supp. at 262 ("[A]n affirmative defense puts the plaintiff on notice that matters extraneous to his prima facie case are in issue and ordinarily allocates the burden of proof on the issue.") (citing Kouba v. Allstate Ins. Co., 691 F.2d 873 (9th Cir. 1982)); McVay v. Reese, 62 Wash. 562, 563, 114 P. 184 (1911) (defendant has the burden of proving an affirmative defense).

[24] CP at 348-49.

[25] Additionally, the wording of jury instruction 9 did not accomplish the court's stated goal of limiting AP's exposure to only damages resulting from AP's defective performance, as distinguished from damages resulting from Lake Hill's defective plans.

[26] Anfinson, 174 Wn.2d at 860 ("Prejudice is presumed if the instruction contains a clear misstatement of law.").

awarded only a fraction of Lake Hills' requested damages. The special verdict form does not support that conclusion.

The jury awarded zero damages for two of the eight alleged defective areas of work after finding AP liable. As to these two areas, there was evidence of both deficient performance by AP and defective plans and specifications by Lake Hills. For example, Lake Hills' concrete expert testified excessive cracking in the garage slab was caused by late and deficient saw cuts to the concrete, as well as inappropriate placement of types of crack control joints. He testified the plans and specifications did not contribute to the cracks. AP's concrete expert testified he saw no construction errors in the garage slab and the saw cutting and crack control joint placement were irrelevant because the plans and specifications caused the cracking by requiring the use of rebar as reinforcement throughout the slab. Notably, AP's expert agreed the saw cuts did not comply with the plans and specifications but opined the failure to comply was irrelevant because the rebar reinforcement caused the cracking. On this record and with this special verdict form,[27] we cannot rule out the possibility that the incorrect affirmative defense portion of jury instruction 9 impacted the jury award.

Lake Hills contends the trial court should have used its proposed wording that the "construction defect result[ed] solely from the defective or insufficient

---

[27] It is unclear if the jury found AP liable for those areas of work and then absolved it because AP proved its affirmative defense or if the jury did not find AP was liable for those areas of work.

plans or specifications."[28]  Including the word "solely" accords with the rule relied

upon by Lake Hills from Kenney v. Abraham:

> [A] construction contractor who has followed plans and/or specifications furnished by the [owner], his architect or engineer, and which have proved to be defective or insufficient, will not be responsible to the [owner] for loss or damage which results . . . solely from the defective or insufficient plans or specifications.[29]

AP disputes that Kenney supports "solely" because its true holding is found

in that court's reference to White v. Mitchell, where the court explained a

contractor "will be excused only by acts of God, impossibility of performance, or

acts of the other party to the contract, preventing performance."[30]  But the ultimate

holding in Kenney was both that the contractor did not "buil[d] in accordance with

the plans and specifications"[31] and that the rule that a contractor is not responsible

to the owner for damages which result solely from defective plans or specifications

"was not applicable where there is negligence, as in the case at bar, on the

contractor's part."[32]  White does not preclude or conflict with this holding.

---

[28] Appellant's Br. at 28.

[29] 199 Wash. 167, 170, 90 P.2d 713 (1939) (emphasis added) (quoting Annotation, Responsibility of Construction Contractor or His Bond to Contractee for Defects or Insufficiency of Work Attributable to Plans and Specifications Furnished by Latter, His Engineer or Architect, 88 A.L.R. 797, 798 (1934) (replaced by S. Bernstein, Annotation, Construction Contractor's Liability to Contractee for Defects or Insufficiency of Work Attributable to the Latter's Plans and Specifications, 6 A.L.R.3d 1394, § 2 (1966))).

[30] 123 Wash. 630, 634-35, 213 P. 10 (1923).

[31]  Kenney, 199 Wash. at 171.

[32] Id. at 173.

The holding in another case relied upon by AP, <u>Maryland Casualty Company v. Seattle</u>, is consistent.[33]  There, a contractor hired to build a sewer tunnel sued Seattle for additional compensation after choosing a more expensive method of completing the contract, and Seattle refused to pay the additional costs.[34]  Applying the principle from <u>White</u>, the court upheld the trial court's denial of the contractor's claim because the expensive option was not contemplated by the contract and the contractor chose to use the more expensive method when a less expensive, but more difficult, option was contractually authorized.[35]  That holding also does not conflict with the rule identified and applied in <u>Kenney</u> that defective plans and specifications only save the contractor if the damages are solely the result of those defective plans and specifications.

In the construction defect case <u>Valley Construction Company v. Lake Hills Sewer District</u>, our Supreme Court analyzed the case by applying the "well-settled" "general principals" from <u>Kenney</u>, <u>White</u>, and <u>Maryland Casualty</u>.[36]  A contractor filed suit for additional expenses incurred from building a sewer, and the owner counterclaimed for repair costs from the contractor's failure to follow the plans and specifications.[37]  The contractor argued the expenses were necessary to complete the contract after the owner refused to let the contractor change its chosen

---

[33] 9 Wn.2d 666, 116 P.2d 280 (1941).

[34] <u>Id.</u> at 667-68.

[35] <u>Id.</u> at 674-75, 676, 680.

[36] 67 Wn.2d 910, 915-16, 410 P.2d 796 (1965).

[37] <u>Id.</u> at 911.

12

construction method, despite discovering difficult soil conditions.[38]  Citing Kenney,

the court explained the additional difficulty of performing the contract did not

excuse the contractor from its duties and the contractor was not entitled to its

additional costs because it deviated from the contract specifications after the

owner's refusal.[39]

Read together, Kenney, White, Maryland Casualty, and Valley Construction

support the basic contract principle that a party must perform its duties and a

failure to perform entitles the injured party to damages proximately caused by the

breach.[40]  A breach is the proximate cause of damages where it was both the

cause in fact and legal cause of an injury.[41]  A defective plans affirmative defense

can relieve a breaching general contractor of its liability by proving an alternate

proximate cause.  AP's affirmative defense theory was that a single cause,

defective plans or specifications, injured Lake Hills.  To be relieved of all liability for

---

[38] Id. at 911-14.

[39] Id. at 917-18.

[40] See Colorado Structures, Inc. v. Ins. Co. of the W., 161 Wn.2d 577, 589, 167 P.3d 1125 (2007) ("Regardless of whether the breach is 'material,' the promisee can recover damages."); Larson v. Union Inv. & Loan Co., 168 Wash. 5, 12, 10 P.2d 557 (1932) (contract damages can be awarded when foreseeable and proximately caused by breach); Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus., 78 Wn. App. 707, 712, 899 P.2d 6 (1995) ("A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant.") (citing Larson, 168 Wash. at 12; Alpine Indus., Inc. v. Gohl, 30 Wn. App. 750, 754, 637 P.2d 166 (1984)); see also RESTATEMENT (SECOND) OF CONTRACTS § 348(2) (AM. LAW INST. 1981) (defective construction damages compensable where they result from breach).

[41] Nw. Indep. Forest Mfrs., 78 Wn. App. at 713 (citing Hartley v. State, 103 Wn.2d 768, 777, 698 P.2d 77 (1985)).

its breaches, AP had to prove Lake Hills' defective designs "solely" caused the plaintiff's damages. This standard, expressly articulated in <u>Kenney</u>, is also acknowledged by commentators on construction law.[42]

Because the affirmative defense portion of jury instruction 9 clearly misstated the law and under these circumstances, including "solely" would have adequately stated the law, the court abused its discretion.[43]

### B. Jury Instruction 16

Jury instruction 16 governed Lake Hills' claim for liquidated delay damages and stated AP's affirmative defenses to that claim. Lake Hills had to prove:

1. That the terms of the construction contract included a duty for AP to substantially complete each phase by a deadline;

2. That AP failed to meet the substantial completion deadline(s); and

3. That Lake Hills was damaged as a result of AP's breach.[44]

---

[42] <u>See</u> MICHAEL T. CALLAHAN, ET AL., CONSTRUCTION DISPUTES: REPRESENTING THE CONTRACTOR § 20.02 (4th ed. Supp. 2020) ("It is equally well-established that if a contractor builds in a workmanlike manner according to plans or specifications furnished by the owner, the contractor will not be responsible for damages resulting solely from defects in the plans or specifications, assuming, of course, that the contractor has not otherwise contractually assumed responsibility for design."); SCHWARTZKOPF, <u>supra</u>, § 1.07 ("Damages that are calculated even to the smallest degree of detail are of no value if the damages are not causally linked to the entitlement claimed.").

[43] We note that including "solely" may not be the only way to clarify the precise burden of proof for a defective plans affirmative defense, but other options are beyond the scope of the briefing in this appeal.

[44] CP at 357.

If the jury found AP liable, it had to consider its affirmative defenses. Lake Hills assigns error to AP's first affirmative defense absolving it from liability for delays AP proved were "not solely caused by AP."[45]

Lake Hills argues the defense erroneously absolved AP of damages for inexcusable delays by preventing recovery when Lake Hills contributed to a delay. But it also agrees AP was not liable for delay days where both parties contributed to a delay. This contradiction stems from <u>Baldwin v. National Safe Depository Corporation</u>, a 1985 case cited by both parties that seems to provide inconsistent guidance on apportioning liquidated damages.[46]

In <u>Baldwin</u>, the court analyzed whether a lease of four signs allowed for apportionment of liquidated damages where both the lessor and lessee partially breached the contract.[47] The court began its analysis by stating, "The majority rule is a plaintiff cannot recover liquidated damages for a breach to which he has contributed, and there can be no apportionment of liquidated damages where both parties are at fault."[48] Despite this broad statement, the court upheld the trial court's apportionment of liquidated damages because "undue difficulty of proof was not a problem" and "the jury was presented with an adequate basis for allocating the contractual measure of damages to the respective parties."[49] This

---

[45] <u>Id.</u>

[46] 40 Wn. App. 69, 697 P.2d 587 (1985).

[47] <u>Id.</u> at 70-71.

[48] <u>Id.</u> at 72.

[49] <u>Id.</u> at 73.

contradiction reflected the jurisprudence at the time surrounding liquidated damages.

When Baldwin was decided, the majority rule was that liquidated damages should not be apportioned when both parties contributed to the injury.[50] But over the past 30 years, a "strong majority" of jurisdictions have come to allow apportionment of liquidated delay damages.[51] "The modern trend is for courts to endeavor to apportion liquidated damages based on causation of delay as between the owner and contractor."[52] Baldwin itself reflected this trend away from the then-majority rule by relying upon traditional contract principles to uphold the jury's apportionment of liquidated damages.[53] The modern rule is clear and well-

---

[50] 40 Wn. App. at 72; see John Livengood & Daniel S. Brennan, Approaches to Concurrent Delay, 39 CONSTRUCTION LAW. 27, 30 (Winter 2019) ("The reluctance on the part of the courts to dissect the factual intricacies associated with concurrent delay continued into the twentieth century."); BARRY B. BRAMBLE & MICHAEL T. CALLAHAN, CONSTRUCTION DELAY CLAIMS § 11.09 (6th ed. Supp. 2020) ("The traditional view has been that if the delays were inextricably intertwined, the owner was prevented from assessing liquidated damages against the contractor, while the contractor, because of its partial responsibility, was similarly not entitled to damages."); see also WERNER SABO, LEGAL GUIDE TO AIA DOCUMENTS § 8.11 (6th ed. 2020) ("In the past, courts did not favor liquidated damages clauses." (citing Gen. Ins. Co. v. Commerce Hyatt House, 5 Cal. App. 3d 460, 85 Cal. Rptr. 317 (1970))).

[51] Hutton Contracting Co., Inc. v. City of Coffeyville, 487 F.3d 772, 785-86 (10th Cir. 2007) (citing cases); see BRAMBLE & CALLAHAN, supra, § 11.09 (explaining the modern process for apportioning concurrent delays).

[52] 5 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., BRUNER AND O'CONNOR ON CONSTRUCTION LAW § 15.82 n.28 (2020) (citing cases).

[53] 40 Wn. App. at 73 ("As here, where actual damages would be difficult to prove and the jury was presented with an adequate basis for allocating the contractual measure of damages to the respective parties, we find no reason to deny apportionment. The jury's verdict represents a just approximation of the damage to each party.").

reasoned: a fact finder can apportion liquidated construction delay damages when the evidence and the parties' contract allow it.[54]

Here, the affirmative defense instruction let the jury excuse AP of delay days it did not cause alone. Lake Hills does not contend the jury mischaracterized the delay days as excusable, inexcusable, or concurrent; does not contend concurrent delay days are apportionable; and does not contend insufficient evidence supported how the jury apportioned the delays. Thus, we need not address how to classify and apportion delay days.[55] Because the instruction properly allowed apportionment of liquidated delay damages, the question is whether the instruction reflected the circumstances here.

---

[54] Id.; see also Hutton, 487 F.3d at 785-86 (applying "the modern view and allow[ing] liquidated damages to be apportioned when faced with damages that are in fact divisible"); Sauer Inc. v. Danzig, 224 F.3d 1340, 1347 (Fed. Cir. 2000) (allowing apportionment of liquidated damages for delay); E. Coast Repair & Fabrication, LLC v. United States, 199 F. Supp. 3d 1006, 1030-31 (E.D. Va. 2016) ("'[A]pportionment' should be permitted [for sequential delay] when the evidence provides a reliable basis on which to determine which party is responsible for which delay.") (citing R.P. Wallace, Inc. v. United States, 63 Fed. Cl. 402, 411-13 (Fed. Cl. 2004)); R.P. Wallace, 63 Fed. Cl. at 413 (explaining "general contractual principles, logic and fairness" support apportionment of liquidated delay damages except when the evidence does not allow for it).

[55] Federal case law provides guidance on these issues. See E. Coast Repair, 199 F. Supp.3d at 1030 (citing George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 243 (2005)) (discussing the federal courts' rules for apportioning liquidated delay damages); R.P. Wallace, 63 Fed. Cl. at 410-13 (distinguishing concurrent and sequential delays), 412 n.16 (noting the common confusion of "sequential" and "concurrent" delays). We also note that commentators explain how to apportion concurrent delays. E.g., BRAMBLE & CALLAHAN, supra, at §§ 1.01(D), 11.09.

17

The first question is whether the contract allowed apportionment. We interpret contracts to carry out the parties' objective intentions.[56] Contract terms are given their ordinary, everyday meaning unless the entirety of the contract demonstrates a contrary intent.[57] The reasonable meaning of the words used reveals the parties' intentions.[58]

Paragraph 10 of section B in exhibit B to the contract authorizes liquidated damages and explains AP must pay $2,500 for each delay day after the 21st day, calculated per project phase. It also requires that AP's substantial completion dates be extended "in the event [Lake Hills] fails to achieve one of the milestone dates [in the contract] and that failure causes . . . [AP] to miss meeting the substantial completion date."[59] Section 8.3.1 of the contract requires that the time for substantial completion be extended if events wholly outside AP's control, including acts by Lake Hills' agents, cause it to be delayed. No time extensions "shall be granted" for delays caused by the AP's failure to place purchase orders.[60] Section 5.3.1 requires all subcontractors hired by AP be held to the same terms in their relationships with AP. The contract reflects the parties' intent to apportion delay days because it requires calculating liquidated damage amounts by

---

[56] Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005).

[57] Id.

[58] Id.

[59] Ex. 1 at LH00027126.

[60] Id. at LH00027107.

examining each day of delay, identifying the cause of delay, and adding or subtracting delay days based on the conduct of each party and its agents.

The second question is whether the contract and evidence presented at trial supported excusing delay days "not solely caused by AP."

The precise phrasing of a jury instruction is within the trial court's discretion.[61] A court abuses its discretion where its decision rests on untenable legal or factual grounds.[62] The court explained it phrased AP's first affirmative defense in jury instruction 16 as a negative statement to keep the instruction simple for the jury. Lake Hills urged the court to require that AP prove Lake Hills or its agents caused the delay days. The court rejected that proposal because it would require instructing the jury on agency, and the court reasoned "that additional language" was "not necessary" because "[i]t's AP's burden to show they didn't cause the delays."[63]

The court's chosen language does not reflect the contract. The parties agreed to apportion delay days based on the conduct of Lake Hills or its agents and AP or its agents. The instruction let the jury excuse AP from any day of delay caused by anything other than itself, including its own agents. Because the

---

[61] Housel, 141 Wn. App. at 758.

[62] Leren v. Kaiser Gypsum Co., Inc., 9 Wn. App. 2d 55, 75, 442 P.3d 273 (2019), as amended on denial of reconsideration (Aug. 8, 2019), review denied sub nom. Leren v. Elementis Chemicals, Inc., 194 Wn.2d 1017, 455 P.3d 133 (2020).

[63] RP (Aug. 15, 2018) at 4769.

instruction misled the jury without misstating the law, reversal is required only if Lake Hills was prejudiced.[64]

Lake Hills argues it was prejudiced because "the jury found AP was not the 'sole' cause of 90 [percent] of the delay on the project."[65]  But the findings do not reflect prejudice from a misleading instruction.  They reflect a credibility determination.  The jury's findings match the testimony from AP's scheduling expert, except for 21 additional delay days it attributed to AP.

AP's expert calculated 355 delay days on phase 3 and excused AP from 313 of them.  The jury did the same.  Notably, the unexcused delay days attributed to AP were caused by a subcontractor.  The expert calculated 476 delay days on phase 5A and excused AP from 410 of them.  The jury did the same.  The expert calculated 384 delay days on phase 5B and excused AP of all of them.  The jury did the same.  The jury deviated from the expert only on phase 2C because it attributed 21 days of delay to AP, while the expert excused AP from all delay days.  Although the language of jury instruction 16 was misleading, Lake Hills fails to show prejudice.[66]

---

[64] Anfinson, 174 Wn.2d at 860.

[65] Appellant's Br. at 32.

[66] Lake Hills argues it was prejudiced because jury instruction 16 "imposed an unfair double standard favoring AP" by using "solely" when jury instruction 9 did not.  Appellant's Br. at 33.  The argument is not compelling.  Lake Hills fails to show how this confused the jury or how it was prejudiced.  Lake Hills also contends a question asked by the jury during deliberations reflected confusion with the instruction, but the actual confusion stemmed from a scrivener's error in the special jury verdict form, which the court remedied.

C.  Jury Instruction 15

Lake Hills' third claim alleged AP breached when it stopped working on the project in late 2015.  AP requested jury instruction 15 to argue any breach from quitting was excused by Lake Hills' prior breach from nonpayment.  Jury instruction 15 states:

> If one party enters into a contract with another, there is an implied agreement by each to do nothing that will hinder, prevent, or interfere with the performance of the contract terms by the other.
>
> If AP proves by a preponderance of the evidence that Lake Hills interfered with or prevented AP from completing its work in its entirety within the time required and/or completing the project in its entirety, then AP was excused from performing its duty of the same.[67]

The jury found AP did not breach by quitting the project.

Lake Hills argues jury instruction 15 improperly excused AP's performance due to a nonmaterial breach of the duties of good faith and fair dealing.

All parties to a contract have implied duties of good faith and fair dealing.[68] A party who breaches this duty by hindering or interfering such that the other party could not perform its obligations "'cannot take advantage of the failure.'"[69]  "If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the

---

[67] CP at 356.

[68] City of Woodinville v. Northshore United Church of Christ, 166 Wn.2d 633, 647, 211 P.3d 406 (2009).

[69] Highlands Plaza, Inc. v. Viking Inv. Corp., 72 Wn.2d 865, 876, 435 P.2d 669 (1967) (quoting 5 WALTER H.E. JAEGER, WILLISTON ON CONTRACTS § 677 (3rd ed. 1957)).

return promise been rendered except for such prevention or hindrance, the condition is excused.'"[70]

A nonmaterial or cured breach will not excuse a party's failure to perform.[71] Accordingly, only a material breach of the duties of good faith and fair dealing excuses the other party's performance.[72]

AP argues that the instruction was "taken nearly verbatim from" Washington pattern jury instruction (WPI) 302.08 and accurately states the law.[73] But "'[t]he

---

[70] Id. at 877 (quoting RESTATEMENT OF CONTRACTS § 295 (AM. LAW INST. 1932)).

[71] See Cartozian & Sons, Inc. v. Ostruske-Murphy, Inc., 64 Wn.2d 1, 5-6, 390 P.2d 548 (1964) ("While any breach will give rise to cause of action for damages, a breach does not become cause for repudiation until it is, under all of the circumstances surrounding the contract, so material as to amount to a substantial or total failure of consideration.") (citing 6 CORBIN, CONTRACTS, § 1253 at 13 (1951) (replaced by 10 JOHN E. MURRAY, JR., CORBIN ON CONTRACTS § 53.12 (rev. ed. 2014)); DC Farms, LLC v. Conagra Foods Lamb Weston, Inc., 179 Wn. App. 205, 220, 317 P.3d 543 (2014) ("Only a breach or nonperformance of a promise by one party to a bilateral contract so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty.") (citing Jacks v. Blazer, 39 Wn.2d 277, 285-86, 235 P.2d 187 (1951)).

[72] See Northshore United Church of Christ, 166 Wn.2d at 647 (noting material breach excuses performance and explaining a city's material breach of the duty of good faith excused performance); see also RESTATEMENT (SECOND) OF CONTRACTS § 237 cmt. b ("[W]here performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties of performance with respect to the expected exchange if there has already been an uncured material failure of performance by the other party. . . . In determining whether there has been a failure of performance, the terms of the agreement and supplementary rules such as . . . the duty of good faith and fair dealing (§ 205) should be considered."); RESTATEMENT (SECOND) OF CONTRACTS § 245 ("Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.").

[73] Resp't's Br. at 27 (citing 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 302.08, at 226 (7th ed. 2019)).

pattern [jury] instructions are not authoritative primary sources of the law.'"[74]  And

the comment to WPI 302.08 expressly recognizes that a party should be excused

only where the breach is material and contributes to the other party's

nonperformance.[75]  The jury should have been instructed that only a material

breach of the duty of good faith and fair dealing by Lake Hills could excuse

performance by AP.

We presume prejudice from a misstatement of the law, but this presumption

can be overcome on a showing that the error was harmless.[76]  Under the very

particular facts presented here, Lake Hills was not prejudiced.

AP's sole theory of excuse was that Lake Hills engaged in massive

underpayments and intentionally "starved AP of resources" to make it quit.[77]  AP's

closely related counterclaim alleged Lake Hills breached the contract by failing to

pay it $5,339,356, which "devastated th[e] project" and caused a "subcontractor

---

[74] Univ. of Washington v. Gov't Emps. Ins. Co., 200 Wn. App. 455, 475, 404 P.3d 559 (2017) (second alteration in original) (quoting 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 0.10, at 3 (6th ed. 2012)).

[75] 25 DAVID K. DEWOLF, KELLER W. ALLEN, & DARLENE BARRIER CARUSO, WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 18:302.08, at 605 (3d ed. 2014) (citing Puget Sound Corp. v. Bush, 45 Wn. App. 312, 724 P.2d 1127 (1986); RESTATEMENT (SECOND) OF CONTRACTS § 245 cmt. b).

[76] Paetsch, 182 Wn.2d at 849 (citing Griffin, 143 Wn.2d at 91-92).

[77] RP (Aug. 16, 2018) at 4982.

revolt."[78]  The jury found for AP and awarded it $5,136,213.53.  The jury's finding

on AP's counterclaim was consistent with a finding of material breach.[79]

Lake Hills argues the jury could have believed AP's argument that Lake

Hills' bad faith payment practices breached the contract, excusing AP's

performance although its conduct was not a material breach.  But the sole theory

of excuse before the jury was based upon massive underpayment by Lake Hills

that devastated AP's ability to continue working, the very essence of a material

breach.[80]  On the particular facts and arguments before the jury, if the jury

accepted AP's theory of excuse, it necessarily was based upon a material breach

by Lake Hills.  The absence of the word "material" in jury instruction 15 was

harmless.

D.  Lake Hills' Rejected Waiver Instruction

Lake Hills argues the court abused its discretion by refusing its proposed

instruction on excuse and waiver.  Lake Hills' proposed instruction stated:

> A plaintiff may not recover for breach of contract if the
> defendant's breach was the result of a prior material breach by [the]
> plaintiff.  Thus, even if a defendant materially breached the contract,
> the plaintiff cannot recover for that breach if the plaintiff material[ly]
> breached the contract first.  In other words, a prior material breach

---

[78] RP (Aug. 16, 2018) at 4955, 4956; CP at 346-47.

[79] See 224 Westlake, LLC v. Engstrom Properties, LLC, 169 Wn. App. 700, 724, 281 P.3d 693 (2012) ("'[A] material breach is one 'serious enough to justify the other party in abandoning the contract . . . one that substantially defeats the purpose of the contract.'") (second alteration in original) (quoting Park Ave. Condo. Owners Ass'n v. Buchan Devs., LLC, 117 Wn. App. 369, 383, 71 P.3d 692 (2003))

[80] See DC Farms, 179 Wn. App. at 220 (material breach "'goes to the root or essence of the contract'") (quoting 15 RICHARD A. LORD & SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 44:55, at 231-32 (4th ed. 2000)).

excuses the defendant's subsequent material breach (i.e. excuses the defendant's continued performance of its obligations under the contract).

However, a defendant cannot rely on a plaintiff's prior material breach to excuse its subsequent breach if the defendant continued to perform under the contract despite its knowledge of the plaintiff's earlier material breach.[81]

Even assuming the instruction is legally accurate, Lake Hills fails to show the trial court abused its discretion by declining to give it. Lake Hills contends it was prejudiced on its delay claim because the absence of the instruction "allow[ed] the jury to excuse all of AP's breaches after July 25, 2014, the date on which the jury found that Lake Hills breached the contract . . . including 108 days of delay AP admitted it caused."[82] The record does not support Lake Hills' argument. The jury did not excuse the 108 delay days AP admitted it caused. Questions 8 through 13 of the special jury verdict form reveal the jury found AP liable for the 108 delay days its scheduling expert testified were caused by AP or its agents.[83] As discussed, the jury's findings about delay days almost exactly matched the apportionment testified to by AP's scheduling expert, and the expert's apportionment did not rely upon payment issues from pay applications to excuse those delays. For example, the scheduling expert excused AP from 197 delay

---

[81] CP at 3719.

[82] Appellant's Reply Br. at 16.

[83] CP at 372 (jury excusing AP from 313 of 355 delay days on phase 3 and from 410 of 476 delay days on phase 5A, totaling 108 nonexcused delay days); Ex. 2882, at 2-3 (scheduling expert identifying 42 nonexcusable days from phase 3 and 66 nonexcusable delay days from phase 5A).

days from phase 5A, the tower/bridge construction, because Lake Hills did not obtain a permit following a redesign. Lake Hills fails to show it was prejudiced.

Lake Hills also contends the absence of the instruction prejudiced its third claim because AP could use Lake Hills' material breaches for nonpayment from June of 2014 to argue it was excused from performing when it quit in late 2015. But Lake Hills' underpayments of AP were ongoing well past June of 2014. AP quit the project in November of 2015 because Lake Hills underpaid by $630,255.94 on AP's most recent pay applications.[84] Because the evidence presented let the jury excuse AP from quitting regardless of underpayments from 2014, Lake Hills fails to demonstrate prejudice. On this record, Lake Hills fails to show the court abused its discretion by refusing its instruction.[85]

II. Comment on the Evidence

As a threshold matter, AP contends Lake Hills waived this issue by not objecting at trial to the judge's allegedly improper comments. Because a comment on the evidence violates a constitutional prohibition, it may be raised for the first time on appeal.[86]

---

[84] Ex. 1014. Notably, the jury found Lake Hills underpaid AP by $2,186,648 on phase 5B of the project, which was under construction when AP quit. CP at 379.

[85] Because Lake Hills fails to demonstrate prejudice from the absence of "material" in jury instruction 15 or the absence of its proposed instruction, the absence of the two could not combine to prejudice Lake Hills, contrary to its contention.

[86] State v. Lampshire, 74 Wn.2d 888, 893, 447 P.2d 727 (1968); see Egede-Nissen v. Crystal Mountain, Inc., 93 Wn.2d 127, 141, 606 P.2d 1214 (1980)

Lake Hills argues the judge commented on the evidence in two ways. First, it argues the judge commented on the evidence by clarifying a key witness's testimony to the jury. Second, it argues the court's conduct amounted to a comment on that witness's credibility.

Article IV, section 16 of the Washington Constitution prohibits a trial judge from commenting on evidence.[87] "'The purpose of article IV, section 16 is to prevent the jury from being influenced by knowledge conveyed to it by the court as to the court's opinion of the evidence submitted.'"[88] A judge impermissibly comments upon a witness's testimony or credibility when the jury is able to infer "'from what the court said or did not say that [the judge] personally believed or disbelieved the testimony in question.'"[89]

Lake Hills contends the "trial court's most egregious intervention" was a clarification the court made during cross-examination of Lake Hills' witness Oscar Del Moro.[90] Del Moro oversaw the Lake Hills Village project on behalf of its owner, including negotiating the construction contract with AP. He testified longer than any other witness, almost seven days.

---

(citing RAP 2.5(a)(3) (discussing timeliness of objections to judicial comments on evidence and noting manifest constitutional error may be raised at any time)).

[87] Risley v. Moberg, 69 Wn.2d 560, 563, 419 P.2d 151 (1966) (quoting WASH. CONST. art. IV, § 16).

[88] Hill v. Cox, 110 Wn. App. 394, 408, 41 P.3d 495 (2002) (quoting State v. Elmore, 139 Wn.2d 250, 275, 985 P.2d 289 (1999)).

[89] Egede-Nissen, 93 Wn.2d at 139 (quoting State v. Browder, 61 Wn.2d 300, 302, 378 P.2d 295 (1963)).

[90] Appellant's Reply Br. at 18.

During direct examination, Del Moro testified that costs, not cracking concerns, influenced AP's request to use welded wire mesh rather than rebar to reinforce the concrete topping slab. On cross-examination, AP played an audio recording of a meeting Del Moro had with AP's employees to discuss construction schedules and designs, including the topping slab. They did not discuss cost savings. After playing the recording, the following exchange occurred:

> Q: Mr. Del Moro, having listened to that recording and reviewing it on paper, there is absolutely zero discussion of cost savings regarding the substitution request, is there?
>
> A: That is correct. And I clarified that to you in my deposition earlier.
>
> COURT: Okay. "That is absolutely correct" is what the jury will consider.[91]

This exchange occurred after there had been a series of rulings by the court on Del Moro's responsiveness to particular questions.

In the context of the recording and the questions, no reasonable juror could have inferred any comment on the truth of the evidence from the judge adding the word "absolutely." The recording effectively impeached Del Moro, and the court's comment clarified the relevant portion of his response to AP's question. Contrary to Lake Hills' view of the exchange, the court did not "instruct[ ] the jury that it must accept as 'absolutely correct' Del Moro's testimony as characterized by AP."[92] Although the judge added "absolutely," the extra word merely affirmed the relevant

---

[91] RP (July 9, 2018) at 1166.

[92] Appellant's Br. at 44.

portion of Del Moro's response to the specific question. The court's clarification was not a comment on the evidence.

Lake Hills also argues the court's conduct during AP's cross-examination of Del Moro amounted to a comment on his credibility, requiring reversal and remand to a different judge.

A trial judge has wide discretion in managing the courtroom.[93] A judge also has discretion to interrogate witnesses, interject to prevent undue repetition of testimony, or ask a witness to clarify.[94] But "[a] trial judge should not enter into the fray of combat nor assume the role of counsel."[95] An "isolated instance," especially if invited and limited under the circumstances, is likely harmless error and curable by an instruction, but "the cumulative effect of repeated interjections by the court may constitute reversible error."[96]

AP argues the court was merely exercising its considerable discretion to manage the trial and "rein in an uncooperative witness."[97] The record supports AP. By the time AP began cross-examination, Del Moro had testified for six days

---

[93] In re Marriage of Zigler & Sidwell, 154 Wn. App. 803, 815, 226 P.3d 202 (2010) (citing State v. Johnson, 77 Wn.2d 423, 426, 462 P.2d 933 (1969)).

[94] United States v. Morgan, 376 F.3d 1002, 1008 (9th Cir. 2004) (quoting United States v. Mostella, 802 F.2d 358, 361 (9th Cir. 1986)); In re Welfare of Burtts, 12 Wn. App. 564, 577, 530 P.2d 709 (1975) (quoting Dennis v. McArthur, 23 Wn.2d 33, 38, 158 P.2d 644 (1945)); ER 614(b).

[95] Egede-Nissen, 93 Wn.2d at 141 (internal quotation marks omitted) (citing Notes, Judicial Intervention in Trials, WASH. U.L.Q. 843 (1973)).

[96] Id.

[97] Resp't's Br. at 36.

and had been admonished repeatedly for speculating, testifying to hearsay, being nonresponsive, and giving narrative responses. At one point, the judge sua sponte stopped Del Moro's lengthy response because he was testifying to hearsay and, when he immediately began giving hearsay testimony again, she said he was "invading" her ruling and told him to "say what you did once you had the conversation, not what they told you."[98] Later, the judge again interrupted Del Moro sua sponte when he began testifying to hearsay and admonished him to "[w]atch your phrasing" and not testify to "what other people said to you."[99] Del Moro's own answers invited judicial intervention to prevent the jury from hearing inadmissible evidence.

Lake Hills contends the court commented on the evidence because it "repeatedly admonished Del Moro that he must answer only 'yes' or 'no' despite his protests the questions could not be answered so simply."[100] Lake Hills cites to an exchange to illustrate its point but, considered in context, the court was merely ensuring Del Moro answered simple questions asked by AP's counsel:

> Q: [W]hen you initially filed the complaint, it was about a 2.7 million dollar claim; is that right?
>
> A: I would have to look at it, but I think it's about right.
>
> Q: Now it's a 7.6 million dollar claim, correct?
>
> A: That was a couple of years before we knew the entire scope of what was needed.

---

[98] RP (July 5, 2018) at 877.

[99] Id. at 881.

[100] Appellant's Br. at 45.

> Q: Can you answer 'yes' or 'no,' sir?
>
> A: I need to qualify what you're asking.
>
> > COURT: No, don't make me direct you to answer his question.
>
> A: There were two different scopes between the proposal and the current proposal as to what is needed to repair.
>
> > COURT: The question is, has the amount of the claim increased from about two million to over seven million[?]
>
> A: The amount of the claim has increased by a certain amount based on the different scopes.[101]

Del Moro's refusal to answer simple questions prompted the court's interventions. A review of the record shows the court's numerous interjections were usually prompted by Del Moro's responses and remained within its discretion.[102] Lake Hills fails to show the court's interjections conveyed any personal belief or disbelief in Del Moro's testimony. The judge did not comment on the evidence by attempting to rein in a difficult witness who invited judicial intervention by introducing inappropriate evidence and wasting time with nonresponsive answers. Because Lake Hills' request for retrial before a different judge is tied to its contention the judge impermissibly commented on the evidence, it fails to show a compelling need.

---

[101] RP (July 9, 2018) at 1141-42.

[102] Zigler & Sidwell, 154 Wn. App. at 815 ("We . . . review a trial judge's courtroom management decisions for abuse of discretion.").

III. Evidentiary Rulings

Lake Hills argues it was prejudiced by the court's decision to admit impeachment evidence about its owner. AP argues it was prejudiced by the trial court's refusal to admit statements Lake Hills made to its lender.

We review a court's decision to admit or exclude evidence for abuse of discretion.[103] A decision is outside the court's discretion where it rests on untenable legal or factual grounds.[104] Even if a court erred by admitting improper evidence, a harmless error does not require reversal.[105] An error is harmless "unless it was reasonably probable that it changed the outcome of the trial."[106]

Lake Hills argues it was prejudiced when the court let AP question Lake Hills' owner about her litigation history with other contractors, portraying it as litigious and likely to fight over money. Assuming the court erred by admitting evidence of its owner's litigation history, Lake Hills fails to show it was harmed. A full review of the record shows the court admitted unchallenged evidence of Lake Hills' contentious approach to business. For example, Lake Hills' owner testified

---

[103] Saldivar v. Momah, 145 Wn. App. 365, 394, 186 P.3d 1117 (2008) (citing Hoglund v. Meeks, 139 Wn. App. 854, 875, 170 P.3d 37 (2007)).

[104] Leren, 9 Wn. App. 2d at 75 (citing Hizey v. Carpenter, 119 Wn.2d 251, 268, 830 P.2d 646 (1992)).

[105] Brundridge v. Fluor Fed. Servs., Inc., 164 Wn.2d 432, 452, 191 P.3d 879 (2008).

[106] Id. (citing State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)).

several times about her conflicts with AP over money.[107]  A letter written just a few months into the project in 2013 showed Lake Hills was already unilaterally making significant reductions in its payments to AP, and AP was protesting the cuts.  Jim McPhetridge, AP's senior project manager who had worked with Lake Hills' owner on other projects, testified Lake Hills' billing procedures "caused a lot of contention."[108]  Rod Robertson, AP's second project manager at Lake Hills Village, testified that Del Moro advised him to "finish the job and then sue the shit out of [Lake Hills]" when they spoke about Lake Hills' late progress payments to AP.[109]  Even if the court had refused to let AP ask about Lake Hills' owner's litigiousness, which was merely a few questions to a single witness in a two-month trial, other unchallenged evidence portrayed Lake Hills as litigious and inclined to battle over money.  Lake Hills fails to show those few questions, within a reasonable probability, changed the outcome of the trial.

In its cross appeal, AP contends the court abused its discretion by refusing to admit relevant evidence of certifications Lake Hills made to its lender regarding the quality and progress of construction work on the project when requesting draws.  Lake Hills fails to identify an issue warranting affirmative relief when considerable evidence was admitted regarding the certifications made by Lake

---

[107] E.g., RP (July 18, 2018) at 2039 (testifying about a dispute from July 2015 between Lake Hills and AP over retainage fees).

[108] RP (Aug. 2, 2018) at 3071.

[109] RP (Aug. 8, 2018) at 3739.

Hills to its lender.[110]  Rather than address on appeal whether additional evidence on certifications could have also been admitted at trial, we conclude the court should make its relevancy decisions in the context of the retrial as it unfolds.[111] We decline to offer abstract and speculative guidance in this setting.

IV.  Attorney Fees

Lake Hills asks that this court vacate the trial court's award of fees and remand with instructions about how to evaluate attorney fees.  It contends the court erred by awarding certain expert witness fees, by declining to apply the proportionality approach from Marassai v. Lau,[112] by awarding costs and fees under CR 68, and by how it calculated the amounts awarded.  Because we are reversing and remanding for a new trial, we vacate the trial court's awards of costs and attorney fees.  We decline to reach these issues that may or may not be at issue at the conclusion of a retrial.

Both parties request an award of attorney fees on appeal under their contract, RCW 60.04.021, and RAP 18.1(a).  The contract authorizes an award to the prevailing party of "all of its attorney fees . . . including costs on appeal" in the event of a breach.[113]  RCW 60.04.021 authorizes an award of attorney fees and

---

[110] See RP (July 19, 2018) at 2146-52 (admitting two certifications Lake Hills made to its lender and questioning Lake Hills' owner about them); RP (Aug. 16, 2018) at 4954 (AP quoting the certification language in closing argument).

[111] ER 401; ER 403.

[112] 71 Wn. App. 912, 859 P.2d 605 (1993), abrogated on other grounds by Wachovia SBA Lending, Inc. v. Kraft, 165 Wn.2d 481, 200 P.3d 683 (2009).

[113] Ex. 1 at LH00027155.

expenses to the prevailing party. Because retrial is required, no party is yet the prevailing party for all attorney fees.[114] Thus, pursuant to RAP 18.1(i), we defer to the trial court to determine the ultimate prevailing party or the appropriate proportional amount of attorney fees at the conclusion of the retrial, including any fees incurred on this appeal.

We reverse and remand for a new trial.

_____

WE CONCUR:

_____        Appelwick, J.

---

[114] See Felipe v. Dep't of Labor & Indus., 195 Wn. App. 908, 920, 381 P.3d 205 (2016) ("When an appellate court remands a case for retrial, as we do here, that court cannot properly award fees because the prevailing party has not yet been determined.") (citing Clark County v. McManus, 188 Wn. App. 228, 245, 354 P.3d 868 (2015), rev'd on other grounds, 185 Wn.2d 466, 372 P.3d 764 (2016)).